Case number 12-4444 Henry Stanley v. Colleen Arnold et al. Argument not to exceed 15 minutes per side. Mr. Rogalski, you may proceed with the appellant whenever you're ready. Counselor Rick. Good morning, Your Honor. May it please the Court, Seth Rogalski, counsel for Plaintiff Henry Stanley. This is Plaintiff's appeal of a decision by the District Court of the Southern District of Ohio dismissing the plaintiff's shareholder derivative lawsuit for its reported failure to allege sufficient facts to show that demand was futile against the Board of Directors of Cardinal Health. The DEA, which is Cardinal Health's primary regulator, said that Cardinal Health was a recidivist offender. At the end of 2007-2008, Cardinal Health was hit with three immediate suspension orders whereby the DEA had found that Cardinal Health had posed an imminent danger and threat to the public's safety and well-being by dissemination of oxycodone-hydrocodone tablets. In early 2008, the DEA also entered into order to show cause with respect to a Texas facility of Cardinal Health's, again, with the failure to control the illegal diversion of oxycodone-hydrocodone pills. These four different regulatory proceedings affected 25% of Cardinal Health's distribution facilities in the United States and resulted, according to the DEA, in the distribution, for illegitimate purposes, of approximately 13 million doses of hydrocodone and oxycodone. In 2008, the company entered into a memorandum of understanding with the DEA, settling these administrative proceedings. They paid a $34 million fine, which at the time was the highest fine ever assessed by the DEA for conduct of this sort. The company agreed in this memorandum of understanding to change the way it controlled the diversion of tablets, these illegal tablets. The memorandum of understanding covered all of Cardinal Health's facilities throughout the United States. The memorandum of understanding was also referenced in the annual report of Cardinal Health, which was signed by 7 of the 12 current directors of the board. Now, what this case is about is nothing changed. In February of 2012, the DEA came in and issued another immediate suspension order for the Lakeland, Florida facility of Cardinal Health. This was one of the facilities that was subject to the prior administrative proceedings by the DEA. And in that immediate suspension order, the DEA said that despite the memorandum of understanding, the specific guidance provided to Cardinal Health by the DEA, and despite public information readily available regarding the oxycodone epidemic in Florida, Cardinal Health failed to maintain effective controls against the diversion of controlled substances and other than legitimate purposes. The company ultimately resolved that administrative proceeding by suspending the operations of Lakeland, Florida for two years, costing the company over $100 million a year, and lost sales alone. So who's suing whom for what? The shareholder-driven lawsuit is a lawsuit brought on behalf of the company by a shareholder against the current board of directors of the company. So the company, which is run by the board of directors, is going to sue the board of directors? What happens is the shareholder goes in on behalf of the company to sue the board. That is correct. And under Ohio law, which is applicable here, as this is an Ohio corporation, the shareholder ordinarily makes a demand on the board to bring a suit against itself. However, if the plaintiff can show sufficient facts to show that the board of directors has closed minds and is incapable of considering a demand to sue themselves, then the case can go forward on behalf of the corporation brought by the shareholder. And I understand that's the issue. Can I ask kind of a general question? Sure. I haven't gotten to be honest very many of these cases, but there are sure a bunch of them cited, and they all seem to go off on this, whether the notice is futile. I'm wondering why law firms – I assume you're a law firm. This isn't the first shareholder's review of action you've ever had. No, Your Honor. I practice in Delaware, and I do this for a living. So you people do this for a living. Why is it, in general, and maybe in this case as well, but why is it in all of these cases where we're talking about notice futility, they don't just give the notice? What's going on? Is it because they're afraid it will happen? No, there's really a presumption built into the law that if you make a demand on the Board of Directors to sue and investigate themselves, there is an implicit concession that the Board of Directors is independent and capable of considering that demand. So you conceded something by making it? When you make a demand on the Board, it's an implicit concession that the Board is independent and is capable of considering a demand to sue itself. And that's why it's not often done in cases like this. In our case... It's like remarkable at some point. And that explains it, but it seems remarkable that you would have that because that would then just deter people from making these notices. Well, that's correct, and that's why these cases are... It constitutes concession, you're saying, that they're acting reasonably. That they're independent and that they can consider it. Now, there are all sorts of permutations in the law. For example, a demand can be made where directors can set up a special litigation committee to assess the demand and make a recommendation. If they believe that 8 out of the 10 members of the board are somewhat interested or have a financial interest in the underlying wrongdoing, they possibly could do that. But in a case like this, involving facts that we have here, where 7 of the 12 members of the board were members of the board when the initial wrongdoing occurred in 2007-2008, we believe very strongly that we didn't have to make a demand. We didn't want to make a demand because we didn't feel the board was independent. And therefore, the issue is, was demand excused under a law? I'm just trying to see what drives it. What I'm taking is that they don't... Presumably, the lawyers for your client just sat down and decided that this would not be a good move to make a demand because it would be some sort of implicit concession. Well, there's the tactical issue, but there's also the practical issue. We looked at the board of directors and we said that these 12 members of the board, the members of the board when we filed the lawsuit, are incapable of objectively and independently considering a demand. That all by itself would be enough because you could just wait for them to turn it down? You mean making a demand wouldn't be enough? That wouldn't be enough to decide not to make a demand because what would be the downside? Other than this concession and basically... The other downside is you have to wait a few weeks for them to turn it down. Well, no, the downside is that once you... it's a whole separate proceeding. I don't know if this law is necessarily developed in Ohio. I'm really referring to Delaware law, which is very well built in this area. If they turn it down, then there's a separate litigation. The issue then is was the demand wrongfully refused, which is a different set of principles and presumptions than the issue in front of the court today, which is was demand excused? In other words, were we excused in not making a demand? And isn't your argument there on the practical side, basically the corporation faced the problem once and then it happened again. And so given the fact that they engaged in conduct a second time, in essence, you believe it's futile to go to them because they've already proved that they're not going to fix the problem. Well, that's right, Your Honor, and more than that, what we said was that the board was aware of the misconduct and the problems and deliberately didn't do anything about it. And that arises from the red flags that we cited in our complaint, which the district court really glossed over in its opinion. Well, I understand that. I'm wondering, though, how pervasive a problem really was this with a company that is as large as this? Very pervasive because, as I mentioned before, the immediate suspension orders and the order to show cause in 2007 affected 25% of their distribution facilities in the United States of America. K Cardinal Health is in the business of distributing pills to pharmacies. Not only that, we're dealing with heroin. I mean, that's what we're dealing with. We're dealing with poisonous pills that has caused an incredible health epidemic and this country has affected many, many people. And so this is not just a widget or something that the board wouldn't be aware about. This is a very problematic issue. Also, the company is overseen by the DEA, and the DEA is their primary regulator, and they came down very hard on this company. So it's not a question of in some cases. You know, there are some cases where you have a multinational corporation and there's some wrongdoing in a subsidiary down somewhere, and the allegation is somehow that came up to the board of directors. The board will say, well, how did we know? We didn't know anything about this. This didn't come to our attention. There was a memorandum of understanding that was entered into in 2008 with the DEA that covered all of Cardinal Health's distribution facilities throughout the United States. The memorandum of understanding was referenced in the forum annual report of the company, and it was signed by the chairman of the board of Cardinal Health. It wasn't signed by a general counsel or some low-level functionary. It was signed by the chairman of the board. So what we say are killed, and what the district court got wrong was, how could you suspend common sense and say that we didn't plead facts? Again, this is a pleading motion, that we didn't plead sufficient facts to draw a reasonable inference that the board of directors were aware of the problems and didn't do anything about it. The DEA didn't go away in 2008 after the memorandum of understanding was entered into. As we've alleged in our complaint, the DEA was all over the Lakeland, Florida facility. Administrative warrants were issued. There were references in the affidavits filed by the DEA, which are cited in our complaint, where the DEA was actually speaking with and talking to senior Cardinal Health personnel. For this board of directors to say on a pleading motion, this was some small problem somewhere, is frankly not credible. And also the fact that they didn't know, how could they possibly not know about misconduct that affected 25 percent of their distribution facilities, a memorandum of understanding that was entered into that affects all their facilities, a record fine, and I may add, as I said in the complaint, after the 2007-2008 misconduct, the stock price of Cardinal Health dropped 40 percent. And the current chairman said in press reports, we've lost hundreds of millions of dollars because of these problems. How could the district court have concluded that we didn't plead at least a reasonable inference that the board of directors were aware of these problems and did nothing to resolve them? And that's really what's at the heart of this case. Isn't the district court at fault with your complaint for failing to establish the substantial likelihood that a majority of the directors would be personally liable? That's correct, Your Honor, but that really turned on the issue of knowledge. He said we failed to do that because we didn't establish facts in showing that the board actually knew about the misconduct. So the court's wrong in that in what regard? The court is wrong because the court – basically what the court did was the court failed to credit the reasonable inferences that arise from the red flags, other accounts of misconduct, that the reasonable inferences that the board was aware of this misconduct. The district court said basically in essence that we have to show without any discovery, without any access to information. This is all in an effort to say your failure to give notice was due. That's correct. So it's a couple of levels. That's correct, Your Honor. Okay. Thank you. Thank you. May it please the court, Jack Newman on behalf of the defendants, and I'll be taking the entire 15 minutes on behalf of the defendants. The discussion that we just heard, Your Honors, was all about 2008, and there's no suggestion here that the board or the company was not aware of the events in 2008, and there's no suggestion at all that they didn't try to remedy it. So let's make a big distinction between what happened in 2008 and then what happened in 2012. I offer three governing principles here, and particularly Judge Rogers, in response to one of your questions. First of all, under Ohio law, all of the authority of the company is exercised by or under the direction of the directors, and that includes whether or not to bring a lawsuit. In Ohio, there is a presumption that the board of directors is disinterested and independent and can't exercise that judgment, and that presumption is heightened when, as here, 11 of the 12 directors sitting at the time that this lawsuit was filed are independent. They're not members of the management of the company. So that's point one. Point two is that they would be, and that's the way these cases always arise, Your Honor, because the directors are always named as defendants in these cases, and the courts recognize that, and they recognize also that a shareholder  unless the shareholder shows with factual particularity that a majority is disqualified, that is, unless the shareholder makes an argument. I know there's no categorical rule in these cited cases, but it just seems intuitive that directors are not going to think that there is a legitimate cause of action against what they've done.  The normal rule is to say I don't think it's warranted for the company that I'm a director of assuming. Except that, Your Honor, Ohio law and the law of most states say that you have to give the directors an opportunity to exercise that business judgment unless you can show, with particularized pleading, that it would be futile. Let me suggest, Your Honor, you consider three possible legal regimes here. One is that only the company, never the shareholders, can sue. Now, that would be most consistent with Ohio law and the law of most states. The corporate authority is exercised by or under the direction of the directors. Shareholders can't sue. They can't enter into a corporate contract. They can't do lots of business things. That would be one regime. The other one would be, well, shareholders can always sue. They never have to ask for permission at all. And that would be utterly inconsistent with the corporate form. So what has happened is that courts have, in really court-made law, trying to find a balance between that. And what's that balance? And the balance is, well, if the board of directors can, on standards that are developed, not be shown to be by particularized allegations, and that's what the rules require, that they are not independent, that they have some interest, that they're under some separate influence, then there must be a demand. And in circumstances like this, where there's no identifiable corporate decision that the board of directors was involved in to merge, to sell assets, to sell stock, to buy back stock, some kind of a corporate decision, then the way the law has developed, and it's very clear, it's the law in Ohio too, is that unless you can show that for the underlying events here that are at issue, and that is dealings with respect to the DEA, unless you can show that there is a substantial likelihood that in that underlying circumstance the directors will be found to be liable, then they are not deemed to be disqualified in making the determination. Otherwise, all you would ever have to do is to name all the directors, and then the shareholder brings the lawsuit. It would really do away with the demand requirement. And in Ohio, and this is the third point that I would make. What would be the harm of doing away with the demand requirement? Excuse me, Your Honor? Go ahead. I'm still trying to follow your REP. I mean, did you ask me are we doing away with the demand requirement? No, you said then it would do away with the demand requirement, like that would be the end of the whole middle-of-the-road scheme that you laid out so thoroughly, but I don't see why it would be. It would if all you had to do was name the directors, and then you could file your lawsuit. If naming the directors was a solution to demonstrating utility, then you'd just name it. File a lawsuit, and then if you didn't have a good claim, you'd lose. Well, yes, except what the courts have said is that shareholders don't have the right even to break the claim unless they make a threshold showing. So it's a standing issue. Well, you argue, of course, that there's no threshold showing, but what does that look like? What would it look like in this case where there had just been an abandonment of fiduciary? It would look like a circumstance, Your Honor, in which there was a pleading that the compliance director, Craig Morford, the former acting deputy attorney general and an assistant U.S. attorney who was hired in 2008 because of the troubles that the company had at that time. If you had a showing that he reported to the audit committee in 2008 and 2009 and 2010, early 2011, sometime during their stay, you know, we're still selling down in Florida to these four pharmacies. We've looked at them. We think they're very suspicious, but, you know, this is an economic issue for us, so we're going to continue to sell to them. Doesn't the McCall case lay out the scenario? It does a good job to lay out a scenario that holds directors responsible because they, or at least would show the futility because the directors had audit committee reports. They said, nevertheless, let's get more customers. So I think there was a lot of bad acting going on there. Yes, Your Honor. That's exactly right. The McCall situation, which is a Sixth Circuit case, would be one circumstance. Then you have the Farrow case, which is a subsequent case, and that case deals also with what the board did or didn't know and said in that case it's not enough. But, yes, and in McCall, actually, McCall is kind of important even though it goes the other direction, but it's important because it does show the kinds of things that can demonstrate futility on a particularized basis. And even more significantly, or equally significantly, the things that came up in McCall were things that were coming up, let me say, on a modern basis that is during the period of time that is under examination. Here, there is this much to show what came or could have come to the zero, what came or could have come to the attention of the board from the latter part of 2008, 2009, 2010, to the very end of 2011 when the DEA again got active in a limited place down in Florida. No information whatsoever during that period of time about anything that came to the attention of the board of directors. And let me just suggest that if you look at the complaint and you look at Exhibit C to the complaint, the Michelle Lenhardt affidavit, she's the administrator of the Drug Enforcement Administration, and if you look at those portions of the pleading record, you'll find that Cardinal had a suspicious order monitoring program. It set thresholds. It held up deliveries under certain circumstances. It made site visits to these customers. It made risk assessments. It terminated some customers. But what Michelle Lenhardt said was, I know you have a national compliance program. Craig Morford, who is in charge of compliance and now is in charge of all the legal function, was actually, at the time he was deputy attorney general, Michelle Lenhardt, the head of the DEA, reported to him. He knew her, and then he came to Cardinal and helped to set up this program. What she said was, the letter that Cardinal sent to me in the latter part of 2011 about its national anti-diversion program, including the number of employees it has, the $60 million it has spent, a brief outline of its suspicious order monitoring problems, its ongoing training of employees, its commitment to maintain adequate diversion controls, its on-site inspections, its cessation of distribution to over 300 pharmacies, including at least 50 of them in Florida. But there were instances in Lakeland, Florida, where the program didn't work. This is all about notice and demand, right? Yes. What would have happened if they'd given the notice? Then you wouldn't have been thrown out for lack of notice, right? Then the plaintiffs would not. However, what would have happened, Your Honor, in that... The whole system wouldn't have collapsed, because all they had to do was give the notice. No, that's not actually correct, Your Honor, because the law says you make a demand, and then the board is given an opportunity to consider it, and then the board can consider it in a number of different ways. Does it constitute a concession that the board is independent? It does, yes, except it doesn't constitute a concession that if the board decides not to sue, that that decision is unattackable. The board gets the benefit of the business judgment rule, but there have been instances in which, in fact, Your Honor... That's really what you want. It isn't so much getting the demand and having the chance to act, it's having the chance to act with the benefit of the business judgment rule. You do get the... Yes. And, Your Honor, that's because what Ohio says is the directors have that presumption unless it is shown in this instance by particularized allegations. Is it a presumption that they act in good faith? Yes. But then after that, you examine what they did. Did they turn it down the next day without basis? Did they conduct an investigation? Did they do it themselves? Did they hire other people? This is what it's really about, is whether they need to be given the chance to do that before they proceed. At the time this case was filed for these plaintiffs, that's what it would be about, yes. Now, if they wanted to make a demand, they still could make a demand? Sure. That's right. I mean, what they're precluded from now is just going ahead and suing without making a demand. So they could make a demand now? They'd be out of time or not? Well, the statute of limitations... Actually, Your Honor... Maybe that's beyond the scope. I would say that it is, but then you get into all sorts of other issues. Lest the court think I'm not being entirely candid here, some other shareholder did make a demand. And the company went into committee and considered it. So... That's on the record. This is the subject of a later filing. Excuse me, Your Honor? There was a later filing. Is that the subject of that? No, Your Honor, that's a different... In the Himmel case, which we brought to the court's attention, a different shareholder filed in state court and sought to proceed without making a demand. And Judge Bessie, sitting by assignment in Delaware County, said, no, you can't proceed. That's the Himmel case. No, there's yet another one that's a matter of public information that a shareholder did make a demand, and the company has handled that. But in this case, the law is clear that unless the sitting directors at the time the lawsuit is filed are demonstrated to be substantially likely to be found liable in an underlying case... And I ask you, what conceivable evidence is there of that here? There is simply nothing. And in fact, everything that suggests that what happened here, which involved four pharmacies in Florida, to the extent there was a problem, to the extent there was a failure, in the eyes of the DEA, it was a failure in boots-on-the-ground judgments and examinations  It was nothing to suggest that there was some kind of a nationwide corporate policy or anything else that either caused that to happen or allowed it to happen. In your opinion, counsel, did the district court get it entirely right? In my opinion, yes, Your Honor. The district court did get it right. And remember what the underlying standard is for director liability, for director monetary liability, which is intent to harm the company or abandonment of the company's interests established by clear and convincing evidence. Thank you. Just a couple of points. First of all, paragraph 85 of the complaint makes it clear the DEA didn't think this was some small, tiny problem or that the company had remediated the problem. I cited to the court in the beginning of the argument, despite the memorandum of understanding, the guidance provided to Cardinal by the DEO, despite the public information readily available regarding oxycodone epidemic in Florida, Cardinal failed to maintain effective controls against diversion of controlled substances for other than legitimate purposes. You heard counsel tell us that there is zero evidence with respect to the directors who served in 2012. That's incorrect. Okay, so would you address that? Yes, that's really incorrect. First of all, this is a pleading. We don't need a pleading. So that's what I'm asking, address the pleading. Right, but I want to make it clear because when the court asked about what do you think a case would look like, well, this specific person received a specific report or talked to the UN Committee on this date. I don't have discovery. I don't have those documents. That's an impossible pleading standard. With respect to the actual knowledge... Is the McCall case, then, a summary judgment? No, and the McCall case, frankly, the McCall case is frankly directly in a point with what we're doing here. So there is evidence of notices from the audit committee and reports that were also... In the McCall case... ...for the board members individually. In the McCall case, yes, Your Honor, in the McCall case, the court looked at six different factors, including New York Times reports, news reports, investigations by federal regulators. The first thing the court looked at was the experience of the board of directors. As to this... You only have a minute. I took the judge's question to be what do you have in this case, not what they had in the McCall case. Well, we have... In this case, we have numerous... Sorry. We have inferences arising out of the following. We have the... We have three... Three major disruptive events in the 2007-2008. We have the memorandum... We're talking... Council tells us we only can focus on the membership of the board in 2012 and the events then. No, that's incorrect, Your Honor, because the issue is that when you look at the experience of the board in the red flags, seven members of the current board of directors, when we filed, were members of the board in 2007. So the knowledge of the underlying misconduct is known to those seven. We just need to show that a majority of the board aren't disinterested. The district court ignored all the 2007-2008 red flags, didn't consider it. So the seven members... I think the court took it that the board members could be assured that they knew about the remedies that were put in place. Well, the problem is that, as we said in our complaint, we've pled... 2007 red flags were pled in detail. As for the ongoing misconduct, we've said in the complaint a number of things. Number one, that the DEA investigation continued to Lakeland, Florida, between 2008 and 2011. But if you look at the subpoenas and look at the documents that were filed and referenced in our complaint, you will see that the DEA references conversations it had with senior Cardinal Health executives and people at the company about what was going on in Lakeland. You want us to take... Your time's expired, so... You're asking us to take what is known to, through the DEA, and infer that the individual board members will know that. Because of the materiality of it, because of the importance of those issues to the company, and because of the board's responsibility to manage the business affairs of the company. Thank you. Thank you, Your Honor. Thank you, counsel. Another interesting case. Thank you very much. Case is resubmitted. Do we have one more case? Yes.